**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

JOSHUA ESPINAL,

     Plaintiff,

vs.                                                          CASE NO.:

TABLE 26 LTD
Florida Limited Partnership                    INJUNCTIVE RELIEF SOUGHT
d/b/a TABLE 26

     Defendant(s).

### <u>COMPLAINT</u>

Plaintiff, JOSHUA ESPINAL (hereinafter "ESPINAL"), by and through the undersigned counsel, hereby files this Complaint and sues TABLE 26 LTD, Florida Limited Partnership, d/b/a TABLE 26 ("Defendant"), for declaratory and injunctive relief pursuant to 28 U.S.C. §§2201 and 2202, attorneys' fees, litigation expenses, costs (including, but not limited to, court costs and expert fees) for unlawful disability discrimination pursuant Title III of the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §§ 12181-12189 ("ADA"), and the regulations implementing the ADA set for in 28 C.F.R. Part 36, et seq, and alleges as follows:

1. This action arises from Defendant's failure to make Defendant's online platform located at www.table26palmbeach.com (hereinafter "Defendant's Website") compatible with screen access software, thereby denying blind individuals, including ESPINAL, full and equal access to Defendant's products and services.

1

2.      ESPINAL files this lawsuit because Defendant's policies exclude him—and millions of other potential consumers—from fully and equally enjoying Defendant's products and services.

3.      Accordingly, ESPINAL seeks an order requiring that Defendant make Defendant's Website accessible and adopt sufficient policies and practices to ensure Defendant's Website does not become inaccessible again in the future.

## JURISDICTION AND VENUE

4.      This Court is vested with original jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. §1343 for Plaintiff's claims arising under Title 42 U.S.C. §§ 12181-12189, based on Defendant's violations of Title III of the ADA. *See also,* 28 U.S.C. §§ 2201, 2202, as well as the 2010 ADA Standards.

5.      Venue is proper in this Court, West Palm Beach Division, pursuant to 28 U.S.C. § 1391(B) and Internal Operating Procedures for the United States District Court for the Southern District of Florida in that a substantial part of the acts and omissions giving rise to ESPINAL's claims occurred in Palm Beach County, Florida.

6.      Defendant attempts to, and indeed does, participate in Palm Beach County's economic life by offering and providing products and services over the internet to Palm Beach County's residents, but also extends it services to other residents within the state of Florida through its online presence, including ESPINAL, who is a resident of Flagler County, Florida. Defendant purposefully avails itself of the benefits and advantages of operating an interactive, online business open 24-hours a day, 7-days a week, 365-days a year to Florida residents. Indeed, upon information and belief, Defendant places cookies on computers and other electronic devices physically located throughout Florida every time a Florida resident visits Defendant's Website.

7.      Further, Defendant operates a Principal Place of Business with a physical address of 1700 South Dixie Highway, West Palm Beach, Florida 33401 (hereinafter "Defendant's Principal Place of Business"), which is located in Palm Beach County, Florida.

8.      ESPINAL was injured when he attempted to access Defendant's Website and encountered communication barriers that denied him full and equal access to Defendant's online products, content, services, and other information that Defendant is interested in communicating/offering to its customers.

## PARTIES

9.      ESPINAL is a natural person over the age of 18 and is blind.

10.     ESPINAL is *sui juris* and is a resident of the State of Florida residing in Palm Coast, Florida, located in Flagler County.

11.     ESPINAL is disabled as defined by the ADA and is therefore a member of a protected class under Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12102(2), and the regulations implementing the ADA set forth at 28 CFR §§ 36.101 et seq. More specifically, ESPINAL is legally blind from Traction Retinal Detachment, Neovascular Glaucoma, and other ocular complications caused by Diabetes Type I, and therefore is substantially limited in performing one or more major life activities, including but not limited to accurately visualizing his world. As a result of his visual impairment, ESPINAL uses screen access software to access digital content, like text messages, emails, and websites.

12.     ESPINAL cannot use his computer without the assistance of appropriate and available auxiliary aids, screen reader software, and other technology and assistance. Screen reader software translates the visual internet into an auditory equivalent. At a rapid pace, the software

3

reads the content of a webpage to the user. As explained in the Eastern District of New York

holding of *Andrews v. Blick Art Materials, LLC*:

> The screen reading software uses auditory cues to allow a visually impaired user to effectively use websites. For example, when using the visual internet, a seeing user learns that a link may be 'clicked,' which will bring him to another webpage, through visual cues, such as a change in the color of the text (often text is turned from black to blue). When the sighted user's cursor hovers over the link, it changes from an arrow symbol to a hand. The screen reading software uses auditory -- rather than visual -- cues to relay this same information. When a sight impaired individual reaches a link that may be 'clicked on,' the software reads the link to the user, and after reading the text of the link says the word 'clickable.'...Through a series of auditory cues read aloud by the screen reader, the visually impaired user can navigate a website by listening and responding with his keyboard.

*Andrews v. Blick Art Materials, LLC*, 286 F.Supp.3d 365, 374 (E.D.N.Y.2017).

13.     ESPINAL's blindness limits him in the performance of major life activities, including sight, and he requires assistive technologies, auxiliary aids, and services for effective communication, including communication in connection with his use of a computer.

14.     ESPINAL frequently accesses the internet. Due to blindness, to effectively communicate and comprehend information available on the internet and thereby access and comprehend websites, ESPINAL uses commercially available screen reader software to interface with the various websites.

15.     Defendant is Florida Limited Partnership with a Principal Place of Business of 1700 South Dixie Highway, West Palm Beach, Florida 33401  (hereinafter "Defendant's Principal Place of Business").

16.     Defendant operates Defendant's Webiste, an online platform through which customers can learn about and engage with Defendant's services, including viewing menus, making reservations, and obtaining information about dining experiencecs offered by Defendant. Defendant's Website promotes Defendant's Principal Place of Business, highlights featured

dishes, provides details regarding hours of operation, special events, and private dining opportunities, and facilitates customer interaction through reservation and contact features. Defendant's Principal Place of Business offers in-person dining consistent with the services and experiences advertised online. In order to access, research, or purchase Defendant's products and services, consumers may visit Defendant's online store located at www.table26palmbeach.com.

17.     Defendant owns, operates, maintains, and/or controls Defendant's Website and is responsible for the policies, practices, and procedures concerning Defendant's Website's development and maintenance.

18.     Defendant's Principal Place of Business is also open to the public. As such, it is a Place of Public Accommodation subject to the requirements of Title III of the ADA and it's implementing regulation as defined by 42 U.S.C. §12181(7)(B), §12182, and 28 C.F.R. §36.104(2). Defendant's Principal Place of Business is also referenced as "place of public accommodation".

19.     There is a clear nexus between Defendant's Website and Defendant's Principal Place of Business, as Defendant's Website is used to advertise, promote, and facilitate the goods and services offered at Defendant's Principal Place of Business. Through Defendant's Website, customers are able to view menus, learn about the dining experience, make reservations, and obtain directions to Defendant's Principal Place of Business, thereby directly connecting online activity to in-person patronage. Defendant's Website functions as an extension of Defendant's Principal Place of Business operations by encouraging customers to visit Defendant's Principal Place of Business and by providing essential information necessary to access and utilize the services offered at Defendant's Principal Place of Business.

20.     At all times material hereto, Defendant was and still is an organization owning, operating, and/or controlling Defendant's Website. Since Defendant's Website is open to the public through the internet, by this nexus Defendant's Website is an intangible service, privilege, and advantage of Defendant's Principal Place of Business that must comply with all requirements of the ADA, must not discriminate against individuals with visual disabilities, and must not deny those individuals the same full and equal access to and enjoyment of the goods, services, privileges, and advantages as are afforded the non-visually disabled public both online and in Defendant's Principal Place of Business. As such, Defendant has subjected itself and Defendant's Website to the requirements of the ADA.

### FACTUAL AND SUBSTANTIVE ALLEGATIONS

21.      ESPINAL is and has been a customer who is interested in patronizing and intends to patronize in the near future, once Defendant's Website's access barriers are removed or remedied, Defendant's Principal Place of Business.

22.     There is a direct nexus between Defendant's Website and Defendant's Principal Place of Business, as Defendant's Website serves as a primary tool to promote and facilitate the services offered at Defendant's Principal Place of Business. By enabling users to make reservations, view offerings, and obtain directions, Defendant's Website functions as an integral extension of Defendant's in-person operations, including online engagement with on-site dining and services provided at Defendant's Principal Place of Business.

23.     Defendants' Website is additionally used to search for brick and mortar store locations, check store hours and offerings, pricing, purchasing, and sign up for electronic mailers to receive offers, benefits, exclusive invitations, and discounts for use at Defendant's Website or in Defendant's Principal Place of Business.

24.     The opportunity to search and pre-search the services offered by Defendant through Defendant's Website, including reviewing menus, making reservations, and obtaining information about Defendant's Principal Place of Business from his home are important accommodations for ESPINAL because traveling outside of his home as a visually disabled individual is often a difficult, hazardous, frightening, frustrating and confusing experience. Defendant has not provided its business information in any other digital format that is accessible for use by blind and visually impaired individuals using the screen reader software, thereby limiting ESPINAL's ability to independently access the goods and services offered by Defendant..

25.     Like many consumers, ESPINAL accesses numerous websites at a time to compare offerings, prices, sales, discounts, events, and promotions. ESPINAL may view several dozen websites to compare features, discounts, promotions, and prices.

26.     ESPINAL utilizes screen reader software that allows individuals who are visually disabled to communicate with websites. However, Defendant's Website contains access barriers that prevent free and full use by visually disabled individuals using keyboards and available screen reader software.

27.     On or about the following dates, ESPINAL attempted to utilize Defendant's Website:

a.      January 18, 2026;

b.      January 30, 2026;

c.      February 14, 2026;

d.      March 01, 2026;

e.      March 16, 2026;

7

f.      March 31, 2026; and

g.      April 06, 2026.

(hereinafter "ESPINAL's Website Visits"). During ESPINAL's Website Visits, ESPINAL experienced substantial access barriers and, thus, was denied fair and equal access to same. ESPINAL was attempting to browse the offerings and online offers to educate himself as to the offerings, sales, discounts, and promotions being offered, and with the intent of making a purchase through Defendant's Website or at Defendant's Principal Place of Business.

28.     While notice to Defendant is not required, ESPINAL sent a pre-suit communication on January 30, 2026. As such, Defendant was on notice and yet still has failed to correct the barriers to access on Defendant's Website.

29.     Prior to initiating suit, but following the sending of the pre-suit communications, ESPINAL has continued to attempt to utilize Defendant's Website during ESPINAL's Website Visits to browse and educate himself as to the offerings, sales, discounts, and online promotions, with the intent of making a purchase through Defendant's Website or at Defendant's Principal Place of Business.

30.     However, Defendant's Website continued to contain access barriers that prevented free and full use by visually disabled individuals using keyboards and available screen reader software.

## VIOLATIONS OF THE AMERICANS WITH DISABILITIES ACT

31.     ESPINAL adopts and re-alleges the allegations stated in paragraphs 1 through 30 above as if fully stated herein.

32.     On July 26, 1990, Congress enacted the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12101 et. seq. Commercial enterprises were provided one and a half (1.5) years from

8

enactment of the statute to implement its requirements.  The effective date of Title III of the ADA was January 26, 1992, or January 26, 1993, if Defendant(s) have ten (10) or fewer employees and gross receipts of $500,000.00 or less. *See* 42 U.S.C. § 12182; 28 C.F.R. § 36.508(a).

33.     Congress found, among other things, that:

a.     some 43,000,000 Americans have one or more physical or mental disabilities, and this number shall increase as the population continues to grow older;

b.     historically, society has tended to isolate and segregate individuals with disabilities and, despite some improvements, such forms of discrimination against disabled individuals continue to be a pervasive social problem, requiring serious attention;

c.     discrimination against disabled individuals persists in such critical areas as employment, housing, public accommodations, transportation, communication, recreation, institutionalization, health services, voting and access to public services and public facilities;

d.     individuals with disabilities continually suffer forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural, transportation, and communication barriers, failure to make modifications to existing facilities and practices. Exclusionary qualification standards and criteria, segregation, and regulation to lesser services, programs, benefits, or other opportunities; and,

e.     the continuing existence of unfair and unnecessary discrimination and prejudice denies people with disabilities the opportunity to compete on an equal basis and to pursue those opportunities for which our country is justifiably famous, and accosts

the United States billions of dollars in unnecessary expenses resulting from dependency and non-productivity.

42 U.S.C. § 12101(a)(1)-(3),(5) and (9).

34.     Congress explicitly stated that the purpose of the ADA was to:

a.      provide a clear and comprehensive national mandate for elimination of discrimination against individuals with disabilities;

b.      provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities; and

c.      invoke the sweep of congressional authority, including the power to enforce the Fourteenth Amendment and to regulate commerce, in order to address the major areas of discrimination faced on a daily basis by people with disabilities.

U.S.C. § 12101(b)(1)(2) and (4).

35.     Section 302(a) of Title III of the ADA, 42 U.S.C. § 12101 et seq., provides: "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a).

36.     "Congress passed the ADA in 1990 to fix a serious problem—namely, the seclusion of people with disabilities resulting in explicit and implicit discrimination. . . . The disabled population hoped that, as a result of the ADA, their lives would no longer be shaped by limited access and the inability to choose. . . . However, reality—a lack of compliance with the ADA and severe underenforcement of the statute—soon destroyed this hope."[1]

---

[1] Kelly Johnson, *Testers Standing up for the Title III of the ADA*, 59 Cas. W. Res. L. Rev. 683, 684 (2009), http://scholarlycommons.law.case.edu/caselrev/vol59/iss3/6 (citing H.R. REP. No.

37.     More than thirty years "after the passage of the ADA, numerous facilities are still not compliant leaving the disabled population in a second-class citizenship limbo. Title III of the ADA allows both the U.S. Attorney General[2] and private individuals[3] to sue, but the rate at which [ ] the Attorney General [is] bringing suit seeking compliance is extremely low. The Department of Justice's Disability Section, tasked with ADA enforcement, is understaffed[.]"[4]

38.     Thus, "private suits by necessity represent the main tool for ensuring compliance with Congress' intent in passing the ADA,"[5] most of which suits "are brought by a small number of private plaintiffs who view themselves as champions of the disabled." [6]

39.     The U.S. Department of Justice ("DOJ") supports this dynamic, recognizing that because it "cannot investigate every place of public accommodation," "[p]rivate plaintiffs play an important role in enforcing the ADA[.]"[7]

40.     Consistent with these policies, ESPINAL files this case to ensure Defendant provides full and equal access to the goods and services that Defendant offers to the public from Defendant's Principal Place of Business and/or physical facilities.

---

101-485, pt. 2, at 28-29 (1990); Elizabeth Keadle Markey, *The ADA's Last Stand?: Standing and the Americans with Disabilities Act*, 71 Fordham L. Rev. 185 (2002) (arguing for a more lenient standard for standing under the ADA); and Samuel R. Bagenstos, *The Perversity of Limited Civil Rights Remedies: The Case of "Abusive" ADA Litigation*, 54 UCLA L. Rev. 1, 3 (2006) (discussing the need for private enforcement in Title III)).

[2] 42 U.S.C. § 12188(b).

[3] 42 U.S.C. § 12188(a).

[4] Johnson, *supra* note 8.

[5] *Betancourt v. Ingram Park Mall*, 735 F. Supp. 2d 587, 596 (W.D. Tex. 2010).

[6] *Id.* (*quoting Molski v. Evergreen Dynasty Corp.*, 500 F.3d 1047, 1062 (9th Cir. 2007)); *D'Lil v. Best Western Encina Lodge & Suites*, 538 F.3d 1031, 1040 (9th Cir. 2008).

[7] Statement of Interest of the United States of America, *ERC v. Abercrombie & Fitch Co.*, No. 1:09-cv-03157 (D. Md.), ECF No. 38, at *1 (July 6, 2010); *See also Hensley v. Eckerhart*, 461 U.S. 424, 445 (1983) ("All of these civil rights laws depend heavily upon private enforcement, and fee awards have proved an essential remedy if private citizens are to have a meaningful opportunity to vindicate the important Congressional policies which these laws contain.").

41.     Defendant's Principal Place of Business and Defendant's Website are public accommodations within the definition of Title III of the ADA, 42 U.S.C. § 12181(7).

42.     There is a physical nexus between Defendant's Website and Defendant's Principal Place of Business in that Defendant's Website provides the contact information, physical address, operating hours, and access to products found at Defendant's Principal Place of Business. Defendant's Website acts as the digital extension of Defendant's Principal Place of Business providing prospective customers the ability to search for and review Defendant's offering, including menus, reservations, and event information, and to plan visits to Defendant's Principal Place of Business at all times, including during non-business hours. Defendant's Website further enables users to obtain directions, contact Defendant, and engage with services intended to be used at Defendant's Principal Place of Business, thereby encouraging and facilitating in-person patronage at all times. By offering these features, Defendant's Website is inextricably linked ot Defendant's Principal Place of Business and serves as a continuous point of access to Defendant's goods and services at all times, regardless of whether the user ultimately visits Defendant's Principal Place of Business in person.

43.     Public accommodations under the ADA must ensure that their places of public accommodation provide effective communication for all members of the general public, including individuals with visual disabilities such as Plaintiff.

44.     The broad mandate of the ADA is to provide equal opportunity for individuals with disabilities to participate in and benefit from all aspects of American civic and economic life. That mandate extends to internet e-commerce websites such as the Defendant's Website.

45.     Under Section 302(b)(1) of Title III of the ADA, it is unlawful discrimination to deny individuals with disabilities the opportunity to participate in or benefit from the goods,

services, facilities, privileges, advantages or accommodations of an entity. 42 U.S.C. § 12182(b)(1)(A)(i).

46.     Under Section 302(b)(1) of Title III of the ADA, it is unlawful discrimination to deny individuals with disabilities an opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages or accommodations, which is equal to the opportunities afforded to other individuals. 42 U.S.C. §12182(b)(1)(A)(ii).

47.     Under Section 302(b)(2) of Title III of the ADA, unlawful discrimination also includes, among other things: "a failure to make reasonable modifications in policies, practices or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages or accommodations; and a failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the good, service, facility, privilege, advantage or accommodation being offered or would result in an undue burden." 42 U.S.C. § 12182(b)(2)(A)(ii)-(iii); see also 28 C.F.R. § 36.303(a).

48.     According to 28 C.F.R. §36.303(b)(1), auxiliary aids and services include "voice, text, and video-based telecommunications products and systems". Indeed, 28 C.F.R. §36.303(b)(2) specifically states that screen reader software is an effective method of making visually delivered material available to individuals who are blind or have low vision.

49.     Title III requires that "[a] public accommodation shall furnish appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities." 28 C.F.R. § 36.303(c)(1). The regulation sets forth numerous examples of "auxiliary aids and services," including "...accessible electronic and information technology; or other effective methods of making visually delivered materials available to individuals who are blind or have low vision." 28 C.F.R. § 36.303(b). The acts alleged herein constitute violations of Title III of the ADA, and the regulations promulgated thereunder. ESPINAL, who is blind and has disabilities that substantially limit the major life activity of seeing within the meaning of 42 U.S.C. §§ 12102(1)(A) and (2)(A), and has been denied full and equal access to Defendant's Website because of his disability. He has not been provided services that are provided to other patrons who are not disabled, and/or has been provided services that are inferior to the services provided to non-disabled persons. Defendant has failed to take the required prompt and equitable steps to remedy its discriminatory conduct. These violations are ongoing.

50.     ESPINAL encountered barriers on each of ESPINAL's Website Visits. On or about January 18, 2026, ESPINAL initially attempted to access and/or utilize Defendant's Website, but was unable to, and he continues to be unable to enjoy full and equal access to Defendant's Website and/or understand the content therein because numerous portions of the Defendant's Website do not interface with ESPINAL's screen reader software. Specifically, features of Defendant's Website are inaccessible to ESPINAL's screen reader software, including, but are not limited to, the following (citing the WCAG 2.1 Level A and AA Guidelines and Conformance Levels):

    a.     **Missing "Skip to Content" Link**

        i.  **Issue:** The page does not provide a "Skip to Content" link to allow users to bypass repetitive navigation menus and jump directly to the

main content area. Without this mechanism, keyboard and screen reader users are required to tab through every menu item and header link each time a new page loads, creating a significant accessibility barrier for users who rely solely on keyboard input or assistive technology for navigation.



ii.  **WCAG 2.1 AA Violations:** 2.4.1 - A - Bypass Blocks

iii.  **Impact:** For users who are blind or have motor disabilities and rely on keyboard navigation or screen reader technology, the absence of a "Skip to Content" link means that every page interaction requires traversing all repetitive navigation elements before reaching the primary content. A visible or visually hidden "Skip to Content" link must be present at the top of the page and become visible upon receiving focus, directing keyboard focus to the main content region — typically the <main> element — so that users can efficiently navigate and access key information without unnecessary obstruction.

b.  **Logo Image Is Incorrectly Defined as Heading Level 1**

15

i.  **Issue:** The logo image in the header section is incorrectly defined using a heading level 1 element. This results in an inaccurate page heading structure, preventing screen reader users from identifying the true page title or understanding the content hierarchy. When a logo image is treated as the primary heading, it misrepresents the structural semantics of the page and undermines the ability of assistive technology users to orient themselves within the content.



ii.  **WCAG 2.1 AA Violations:** 1.3.1-A - Info And Relationships

iii.  **Impact:** For users who are blind and rely on screen readers to interpret page structure, the incorrect use of a heading level 1 on a logo image causes significant disorientation. Screen readers announce headings as navigational landmarks, and when a logo is presented as the main heading, blind users cannot determine the actual page title or comprehend the true content hierarchy. The page must contain a single, meaningful heading level 1 that accurately describes the main content, ensuring that content understanding and structural navigation are not compromised for assistive technology users.

**c.**     **Social Media Links Do Not Have Accessible Names**

i. **Issue:** The Instagram and Facebook social media links do not have accessible names assigned to them. As a result, screen readers announce these links without conveying their purpose or destination. Without accessible names, users who rely on assistive technology are unable to identify which social media platform each link leads to, creating a barrier to informed and independent navigation.



ii. **WCAG 2.1 AA Violations:** 1.1.1 - A - Non Text Content

iii. **Impact:** For users who are blind and depend on screen readers, the absence of accessible names on social media links means these interactive elements are announced without any meaningful identification. This prevents blind users from determining the purpose or destination of each link, making independent navigation of these controls unachievable. Each social media link must be assigned a clear and descriptive accessible name — provided through visible text, an aria-label attribute, or meaningful alternative text for icon

images — so that the link purpose is accurately communicated to all assistive technology users.

**d.** **New Window Behavior Not Announced for Social Media Links**

i. **Issue:** The Instagram and Facebook social media links are configured to open in a new browser window; however, this behavior is not defined programmatically or communicated to the user prior to activation. Screen reader and keyboard users are not informed that a new browsing context will be launched, which can result in disorientation and loss of navigational context when the links are activated.



ii. **WCAG 2.1 AA Violations:** 2.4.4 - A - Link Purpose In Context

iii. **Impact:** For users who are blind and navigate using screen readers, the failure to announce that a link opens in a new window creates significant disorientation. When a new browser window opens without prior notice, blind users may lose their place within the original page and be unable to determine what has changed in their browsing environment. Links that open in a new window must clearly

communicate this behavior through visible text, accessible names, or supplementary context so that screen readers announce the new window behavior, enabling users to make an informed decision before activating the link.

e. **Logo Image Has Incomplete Alternative Text**

i. **Issue:** The alternative text assigned to the logo image contains only "Eddie & Ozzie's" and omits the visible text "est. 2012" that is displayed as part of the logo. This results in an incomplete textual representation of the image, meaning that screen reader users do not receive the full information conveyed visually by the logo. When meaningful text within an image is excluded from its alternative text, non-visual users are denied equivalent access to the content.



ii. **WCAG 2.1 AA Violations:** 1.1.1 - A - Non Text Content

iii. **Impact:** For users who are blind and rely on screen readers to interpret image content, incomplete alternative text on the logo means that part of the brand information presented visually is entirely inaccessible. Specifically, the omission of "est. 2012" from the

alternative text deprives blind users of contextual brand information that sighted users perceive at a glance. The alternative text for the logo image must include all meaningful text visible within the image — both "Eddie & Ozzie's" and "est. 2012" — to ensure that screen reader users receive the same complete information as sighted users.

**f.      Missing Programmatic Active State for Navigation Link**

i.  **Issue:** The "Menu" navigation link is visually displayed as active; however, this active state is not programmatically defined. Screen reader users are unable to determine which page is currently selected, as assistive technologies have no programmatic indicator to convey the user's current location within the navigation structure.



ii.  **WCAG 2.1 AA Violations:** 4.1.2 - A - Name Role Value

iii.  **Impact:** Users who are blind or have visual disabilities and rely on screen readers are unable to identify which navigation link is currently active, as the active state is conveyed only through visual styling with no corresponding programmatic signal. Without a programmatic indicator such as aria-current="page", assistive

technologies cannot announce the active state when users navigate through the menu, leaving blind users without the navigational context necessary to understand their current location within the site. The active navigation link must be programmatically identified using semantic markup or ARIA attributes, ensuring that navigation context is fully accessible and clearly communicated to all non-visual users.

**g.      Multiple Heading Level 1 Elements Defined on the Page**

i.  **Issue:** Multiple heading level 1 elements are defined on the page. Heading level 1 is expected to represent the single main topic of a page, and the presence of multiple H1 headings undermines the logical structure and content hierarchy that screen reader users depend on to navigate and understand page content.



ii.  **WCAG 2.1 AA Violations:** 1.3.1 - A - Info And Relationships

iii.  **Impact:** Users who are blind or have visual disabilities and rely on screen readers to navigate by headings are unable to accurately identify the primary topic of the page or understand the content hierarchy when multiple H1 headings are present. Blind users depend

on a single, clearly defined heading level 1 as an entry point for understanding page structure; its duplication creates confusion and significantly impairs efficient navigation. Each page must contain a single, meaningful heading level 1 describing the main content, with additional section titles using appropriate heading levels such as H2 and H3 in logical order, ensuring that page structure and navigation are fully accessible to assistive technology users.

**h.**     **Decorative Image Has Descriptive Alternative Text**

i.  **Issue:** A decorative image on the page has been assigned descriptive alternative text. Decorative images are not intended to convey meaningful information and must be hidden from assistive technologies; providing descriptive alternative text for such images causes screen readers to announce irrelevant content, disrupting the user experience for non-visual users.



ii.  **WCAG 2.1 AA Violations:** 1.1.1 - A - Non Text Content

iii.  **Impact:** Users who are blind or have visual disabilities and rely on screen readers are subjected to unnecessary and irrelevant content

announcements when decorative images are assigned descriptive alternative text, disrupting the flow of information and making it more difficult to focus on meaningful content. For blind users, every piece of announced content carries significance; the announcement of decorative imagery introduces confusion and impedes efficient comprehension of the page. Decorative images must be hidden from assistive technologies using empty alternative text (alt="") or implemented as CSS background images, ensuring that screen readers announce only meaningful content and that the user experience is not compromised for non-visual users.

### i.   The "Contact" Text Is Not Defined as a Heading

i. **Issue:** The "Contact" text is visually presented as a section title but is not defined using a semantic heading element. Screen reader users are unable to identify or navigate to the contact section using heading-based navigation, as the absence of a programmatic heading prevents assistive technologies from recognizing it as a navigable section of the page.



ii. **WCAG 2.1 AA Violations:** 1.3.1 - A - Info And Relationships

iii. **Impact:** Users who are blind or have visual disabilities and rely on screen readers to navigate by headings are unable to locate or access the contact section of the page, as it lacks a programmatic heading element. Blind users frequently navigate web pages by cycling through headings to efficiently find relevant sections; without a properly defined heading for the contact section, this area of the page becomes effectively undiscoverable through assistive technology. Section titles such as "Contact" must be defined using appropriate heading elements, such as h2 or h3, based on the page structure and logical content hierarchy, ensuring that section navigation and content discovery are fully accessible to all assistive technology users.

**j.      New Window Behavior Not Defined for Menu and Order Links**

i. **Issue:** The "DINNER MENU", "WINE MENU", "HAPPY HOUR MENU", and "Order Online" links open in a new window; however, this behavior is not communicated programmatically. Screen reader and keyboard users receive no advance notice that activating these links will open a new window, which can cause disorientation and loss of navigational context for users who rely on assistive technologies.



ii.  **WCAG 2.1 AA Violations:** 2.4.4 - A - Link Purpose In Context

iii.  **Impact:** Users who are blind or have visual disabilities and rely on screen readers, as well as keyboard-only users, are not informed that the "DINNER MENU", "WINE MENU", "HAPPY HOUR MENU", and "Order Online" links will open in a new window, resulting in an unexpected loss of context and disorientation upon activation. For blind users, an unannounced new window can be particularly disruptive, as it alters the browsing environment without warning and may leave users uncertain of their location or how to return to the previous context. Links that open in a new window must clearly communicate this behavior through visible text or accessible names, and assistive technologies must announce the new window behavior so that users can make an informed decision before activating the link, ensuring that navigation remains fully accessible to all users relying on assistive technologies.

k.      **PDF Is Not Accessible**

i. **Issue:** The PDF document lacks proper tagging, rendering its structure, reading order, and content relationships entirely unavailable to assistive technologies. Without the required programmatic tags, users who rely on screen readers are unable to navigate or interact with headings, lists, tables, and form fields contained within the document.



ii. **WCAG 2.1 AA Violations:** 4.1.2 - A, 1.3.1 - A, 2.4.2 - A - Pdf

iii. **Impact:** For individuals who are blind or have visual disabilities and depend on screen readers, this untagged PDF presents an insurmountable barrier to access. The absence of structural tags means that document content, including headings, paragraphs, lists, tables, and form fields, cannot be read, navigated, or interpreted through assistive technology. To remediate this issue, the PDF must be fully tagged so that its structure is programmatically exposed to assistive technologies, with all content elements logically ordered and defined to ensure the document is fully readable, navigable, and operable for screen reader and keyboard-dependent users.

51.     Defendant's Website was subsequently initially audited by Plaintiff's expert, Till Paris, on January 20, 2025, and who confirmed the access barriers that ESPINAL had initially encountered did, in fact, exist. The numerous access barriers found on Defendant's Website by Plaintiff's Expert during this initial audit are set forth in the Declaration of Till Paris, attached hereto as "Composite Exhibit 1". The contents of "Composite Exhibit 1" are incorporated herein by reference. These access barriers rendered Defendant's Website inaccessible to users who are blind and visually disabled, including ESPINAL.

52.     Although Defendant is charged with having knowledge of the violations, Defendant may not have actual knowledge of said violations until this Complaint makes Defendant aware of same.

53.     Here, however, ESPINAL, through counsel, did send a pre-suit communication informing of the barriers to access on January 30, 2026. As such, Defendant was on notice and yet still has failed to correct the barriers to access on Defendant's Website.

54.     On or about April 06, 2026, ESPINAL again attempted to access and/or utilize Defendants' Website, but again was unable to enjoy full and equal access to Defendants' Website and/or understand the content therein because numerous portions of Defendants' Website do not interface with ESPINAL' screen reader software. Specifically, features of Defendants' Website are inaccessible to ESPINAL'S screen reader software, include, but are not limited to, the following (citing the WCAG 2.1 Level A and AA Guidelines and Conformance Levels):

a.     **Missing "Skip to Content" Link**

i. **Issue:** The page lacks a "Skip to Content" link, preventing users from bypassing repetitive navigation menus to access the main content area

27

directly. This omission forces keyboard and screen reader users to navigate through each menu item and header link anew with every page load. Such a deficiency constitutes a substantial accessibility impediment, particularly for those dependent on keyboard or assistive technology for navigation.



ii.  **WCAG 2.1 AA Violations:** 2.4.1 - A - Bypass Blocks

iii.  **Impact:** Users with visual impairments, especially those who are blind, face heightened challenges without a "Skip to Content" link. This essential feature allows direct navigation to primary content, preventing the inefficiency of tabbing through extensive menus and links. The absence of this link creates a significant accessibility barrier, complicating access to vital information and hindering the user experience.

b.  **Logo Image Is Incorrectly Defined as Heading Level 1**

i.  **Issue:** The logo image in the header is incorrectly designated with a heading level 1, disrupting the page's heading structure. This misclassification confounds screen reader users, as it misrepresents

the page's title and content hierarchy, thereby impeding navigation and comprehension.



ii.  **WCAG 2.1 AA Violations:** 1.3.1-A - Info And Relationships

iii.  **Impact:** For visually impaired users reliant on screen readers, an improperly structured heading system can obscure understanding of page content. A logo erroneously marked as a primary heading misguides users about page structure and content, impairing effective navigation and orientation.

c.      **Social Media Links Do Not Have Accessible Names**

i.  **Issue:** The Instagram and Facebook links lack accessible names, preventing screen reader users from discerning their purpose or destination. This oversight obstructs non-visual users from understanding the link's function, posing an insurmountable navigation barrier.



   ii.  **WCAG 2.1 AA Violations:** 1.1.1 - A - Non Text Content

   iii.  **Impact:** Without accessible names, visually impaired users cannot identify the social media platforms linked, hindering their ability to navigate and engage with these links meaningfully. Proper labeling ensures clarity and inclusivity, enabling seamless interaction.

   d.    **New Window Behavior Not Announced for Social Media Links**

   i.  **Issue:** The Instagram and Facebook links generate new windows without programmatically announcing this action, disorienting screen reader and keyboard users. The absence of advance notice about a new browsing context can disrupt user orientation and navigation.



   ii.  **WCAG 2.1 AA Violations:** 2.4.4 - A - Link Purpose In Context

iii. **Impact:** Unannounced new window behavior can disorient visually impaired users, especially those using screen readers, by unexpectedly altering their browsing context. Clearly indicating such behavior aids in maintaining user orientation and smoother navigation.

e.     **Logo Image Has Incomplete Alternative Text**

i. **Issue:** The alternative text for the logo image includes only "Eddie & Ozzie's," omitting "est. 2012" as shown in the logo. This omission deprives screen reader users of receiving the full visual information, thereby impairing comprehension of brand identity.



ii. **WCAG 2.1 AA Violations:** 1.1.1 - A - Non Text Content

iii. **Impact:** Users relying on screen readers miss critical brand identity details when alternative text is incomplete. Full and accurate descriptions ensure equal access to visual information, enhancing understanding and user experience.

f.     **Missing Programmatic Active State for Navigation Link**

i. **Issue:** The "Menu" navigation link is visually indicated as active, yet lacks a programmatically defined active state. This omission poses a significant barrier for screen reader users who are unable to identify the currently selected page. Without a programmatic indicator, assistive technology users cannot discern their current location within the navigation.



ii. **WCAG 2.1 AA Violations:** 4.1.2 - A - Name Role Value

iii. **Impact:** Screen reader users face impediments in determining which page is active when the "Menu" navigation link's active state is not programmatically defined. This lack of programmatic indication results in an inability to comprehend the user's current navigation context, potentially leading to disorientation and inefficient navigation for users with visual disabilities.

g.     **Multiple Heading Level 1 Elements Defined on the Page**

i. **Issue:** The presence of multiple heading level 1 elements on the page disrupts the expected hierarchy, creating confusion for screen reader users who anticipate a single main topic representation. This

32

inconsistency can result in an inability to comprehend the page's structure and content hierarchy.



ii. **WCAG 2.1 AA Violations:** 1.3.1 - A - Info And Relationships

iii. **Impact:** Users relying on screen readers may encounter difficulties in navigating and understanding the page structure when multiple heading level 1 elements are present. This configuration can lead to misinterpretation of the page's main content and negatively impact accessibility for users dependent on heading navigation to structure information.

h.    **Decorative Image Has Descriptive Alternative Text**

i. **Issue:** The visual label of a destination is displayed, but it is not programmatically linked to its corresponding input field. This results in screen reader users hearing the input field announced without an associated label, leading to confusion about the input field's purpose and required information.



ii. **WCAG 2.1 AA Violations:** 1.1.1 - A - Non Text Content

iii. **Impact:** Screen reader users may find it challenging to understand the purpose and requirements of input fields when labels are not properly associated. This lack of association can cause significant obstacles in form completion and data entry tasks for individuals relying on assistive technology.

i. **The "Contact" Text Is Not Defined as a Heading**

i. **Issue:** The "Contact" text is visually represented as a section title but lacks definition as a heading element. This absence of programmatic heading creates difficulties for screen reader users who cannot navigate or identify the section effectively.



ii. **WCAG 2.1 AA Violations:** 1.3.1 - A - Info And Relationships

iii. **Impact:** Users reliant on assistive technology may experience challenges in locating and navigating the "Contact" section without it being defined as a heading. The lack of a programmatic heading can result in disorientation and an inability to efficiently access pertinent content.

**j.**     **New Window Behavior Not Defined for Menu and Order Links**

i. **Issue:** The "Order Online" link opens in a new window, yet this behavior lacks programmatic definition. This omission presents a barrier for screen reader and keyboard users who are uninformed about the new window opening, leading to potential disorientation and navigation challenges.



ii. **WCAG 2.1 AA Violations:** 2.4.4 - A - Link Purpose In Context

iii. **Impact:** The absence of programmatic notification for links that open in new windows can cause confusion and loss of navigation context for screen reader users. This lack of information may result in users

inadvertently losing track of their browsing path, complicating the navigation process for those reliant on assistive technologies.

### k.      The "More Menu" Action Menu Not Programmatically Defined

i.  **Issue:** The "More Menu" action menu lacks proper programmatic definition through semantic HTML or ARIA roles, obstructing assistive technologies from identifying it as a menu and understanding the relationship between the trigger and its menu items. Consequently, screen reader users are unable to perceive the menu's structure, role, or behavior, rendering interaction with the action menu and its options impossible, thus presenting a significant accessibility barrier.



ii.  **WCAG 2.1 AA Violations:** 4.1.2 - A - Menu Button

iii.  **Impact:** Users with visual impairments, particularly those relying on screen readers, are unable to recognize or interact with the "More Menu" due to its lack of semantic structure and ARIA roles. This absence of accessibility features results in users being unable to perceive or access the menu, hindering their ability to perform tasks

reliant on this feature and ultimately creating a substantial barrier to equal access.

**l.      The "More Menu" Action Menu Not Keyboard Accessible**

i.  **Issue:** The "More Menu" action menu is inaccessible via keyboard, preventing users who depend on keyboard navigation from opening the menu or engaging with its options. This presents a major accessibility barrier as interactive elements should be fully operable without mouse usage. Users reliant on screen readers or keyboard-only navigation are thus obstructed from accessing additional actions, making the feature or related tasks unusable.



ii.  **WCAG 2.1 AA Violations:** 2.1.1 - A - Keyboard

iii.  **Impact:** The inaccessibility of the "More Menu" to keyboard users significantly impairs the ability of individuals with visual disabilities, especially those who are blind, to interact with necessary features. The inability to operate the menu without a mouse excludes these users from completing tasks or accessing critical functions, thereby creating a significant barrier to usability and accessibility.

55. Additionally, ESPINAL' expert again audited Defendant's Website on April 07, 2026, and again confirmed the access barriers that ESPINAL encountered do in fact exist. Mr. Paris determined the issues with the website persist and these persistent issues would be a barrier to individuals with low to no vision. Mr. Paris performed a Re-Test Audit based on this April 07, 2026 evaluation. The identified access barriers found on Defendant's Website by Plaintiff's Expert during this April 07, 2026. Evaluation are further set forth in "Composite Exhibit 1."

56. More violations may be present on Defendant's Website, which can and will be determined and proven through the discovery process in this case.

57. There are readily available, well-established guidelines on the internet for making websites accessible to the blind and visually disabled. These guidelines have been followed by other large business entities in making their websites accessible. Incorporating such basic components to make Defendant's Website accessible would neither fundamentally alter the nature of Defendant's business nor would it result in an undue burden to the Defendant.

58. Defendant thus has failed to make reasonable modifications in its policies, practices, or procedures when such modifications are necessary to afford goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, in violation of 28 C.F.R. §36.302.

59. To the best of Plaintiff's belief and knowledge, Defendant has failed to eliminate the specific violations set forth in paragraphs 50, 51, 54 and 55 herein. As a result, Defendant has violated the ADA -- and continues to violate the ADA -- by denying access to Defendant's Website by individuals, such as ESPINAL, with visual disabilities who require the assistance of interface with screen reader software to comprehend and access internet websites. These violations within the Defendant's Website are ongoing.

60.     As a direct and proximate result of Defendant's failure to provide an ADA compliant Website, with a nexus to Defendant's Principal Place of Business, Plaintiff has suffered an injury in fact by being denied full access to and enjoyment of Defendant's Website and Defendant's Principal Place of Business.

61.     Because of the inadequate development and administration of the Defendant's Website, ESPINAL is entitled to injunctive relief pursuant to 42 U.S.C. §12133 and 28 C.F.R. §36.303, to remedy the ongoing disability discrimination.

62.     Enforcement of ESPINAL's rights under the ADA is right and just pursuant to 28 U.S.C. §§2201 and 2202.

63.     ESPINAL has retained the undersigned counsel for the pursuit, filing and prosecution of this action. ESPINAL is entitled to have his reasonable attorneys' fees, costs and expenses paid by Defendant, pursuant to 42 U.S.C. § 12205 and 28 CFR § 36.505.

64.     Pursuant to 42 U.S.C. §12188, this Court is vested with the authority to grant ESPINAL appropriate and necessary injunctive relief; including an order to:

a.     Require Defendant to adopt and implement a web accessibility policy to make publicly available and directly link from the homepage of Defendant's Website to a statement as to the Defendant's policy to ensure persons with disabilities have full and equal enjoyment of the services, facilities, privileges, advantages, and accommodations through the Defendant's Website.

b.     Require Defendant to take the necessary steps to make Defendant's Website readily accessible to and usable by visually disabled users, and during that time period prior to Defendant's Website's being readily accessible, to provide an alternative method

for individuals with visual disabilities to access the information available on Defendant's Website until such time that the requisite modifications are made, and

c.    Require Defendant to provide the appropriate auxiliary aids such that individuals with visual impairments will be able to effectively communicate with Defendant's Website for purposes of viewing and locating Defendant's Principal Place of Business, and becoming informed of and purchasing Defendant's offerings online, and during that time period prior to Defendant's Website's being designed to permit individuals with visual disabilities to effectively communicate, to provide an alternative method for individuals with visual disabilities to effectively communicate for such goods and services made available to the general public through Defendant's Website.

WHEREFORE, ESPINAL requests entry of judgment in his favor and against Defendant for the following relief:

A.    A declaration that Defendant's Website is in violation of the ADA;

B.    An Order requiring Defendant, by a date certain, to update Defendant's Website, and continue to monitor and update Defendant's Website on an ongoing basis, to remove barriers in order that individuals with visual disabilities can access, and continue to access, Defendant's Website and effectively communicate with Defendant's Website to the full extent required by Title III of the ADA;

C.    An Order requiring Defendant, by a date certain, to clearly display the universal disabled logo within Defendant's Website, wherein the logo would lead to a page which would state Defendant's accessibility information, facts, policies, and accommodations. Such a clear display of the disabled logo is to ensure that

40

individuals who are disabled are aware of the availability of the accessible features of Defendant's Website;

D.    An Order requiring Defendant, by a date certain, to provide ongoing support for web accessibility by implementing a website accessibility coordinator, a website application accessibility policy, and providing for website accessibility feedback to ensure compliance thereto;

E.    An Order directing Defendant, by a date certain, to evaluate its policies, practices and procedures toward persons with disabilities, for such reasonable time to allow Defendant to undertake and complete corrective procedures to Defendant's Website;

F.    An Order directing Defendant, by a date certain, to establish a policy of web accessibility and accessibility features for Defendant's Website to ensure effective communication for individuals who are visually disabled;

G.    An Order requiring, by a date certain, that any third-party vendors who participate on Defendant's Website to be fully accessible to the visually disabled;

H.    An Order directing Defendant, by a date certain and at least once yearly thereafter, to provide mandatory web accessibility training to all employees who write or develop programs or code for, or who publish final content to, Defendant's Website on how to conform all web content and services with ADA accessibility requirements and applicable accessibility guidelines;

I.    An Order directing Defendant, by a date certain and at least once every three months thereafter, to conduct automated accessibility tests of Defendant's Website to identify any instances where Defendant's Website is no longer in conformance

41

with the accessibility requirements of the ADA and any applicable accessibility guidelines, and further directing Defendant to send a copy of the twelve (12) quarterly reports to Plaintiff's counsel for review;

J. An Order directing Defendant, by a date certain, to make publicly available and directly link from Defendant's Website's homepage, a statement of Defendant's Accessibility Policy to ensure the persons with disabilities have full and equal enjoyment of Defendant's Website and shall accompany the public policy statement with an accessible means of submitting accessibility questions and problems;

K. An award to Plaintiff of his reasonable attorney's fees, costs, and expenses; and

L. Such other and further relief as the Court deems just and equitable.

Dated: April 29, 2026     Respectfully submitted,

**ADA LEGAL TEAM, LLC**

/s/ Gregory S. Sconzo
Gregory S. Sconzo   #0105553(FL)
Kevin W. Puckett   #70706(MO)
4700 Belleview Avenue, Suite 100C
Kansas City, Missouri 64112
Phone: (816) 890-9599
Facsimile: (816) 203-8590
greg@ADALegalTeam.com
kevin@ADALegalTeam.com

**ATTORNEY FOR PLAINTIFF**

42